## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

)
)
**UPROMISE, INC., et al.,** )
)
      **Plaintiffs,** )
)
      **v.** )      **Civil Action No. 13-cv-12363**
)
**PETER J. ANGUS and INTUITION** )
**SYSTEMS, INC.,** )
)
      **Defendants.** )
)
_____)

## MEMORANDUM AND ORDER

**CASPER, J.**                                                    **January 21, 2014**

### I.      Introduction

Plaintiffs Upromise, Inc., Upromise Investments, Inc. ("UII") and SLM Corporation (collectively referred to as "Upromise") seek preliminary injunctive relief against Defendants Peter J. Angus ("Angus") and Intuition Systems, Inc. ("Intuition") to enjoin Angus from working for Intuition for one year, or in the alternative, to enforce a negotiated settlement agreement, and to enjoin Intuition from employing Angus. D. 3. Intuition has moved to dismiss Upromise's complaint on several grounds. D. 18. Angus has moved to transfer the case to the Middle District of Florida, D. 15, which Intuition joins in the event the Court denies its motion to dismiss. D. 29.

After a hearing on all of these pending motions, the Court took the matters under advisement. D. 39. For the reasons discussed below, the Court DENIES the motion for

preliminary injunction, D. 3; DENIES Intuition's motion to dismiss, D. 18; and DENIES both Defendants' motions to transfer, D. 15 and D. 29.

## II.     Factual Allegations

### A.     <u>Background on 529 Plans</u>

The facts recited are as alleged in the complaint and the filings made in regard to the motion for preliminary injunction.[1]

Qualified tuition plans, or "529 plans," named after Internal Revenue Code Section 529, are tax-deferred investment accounts used to pay for college expenses.  D. 13 ¶¶ 1–2 (Aff. of Peter Angus); D. 13-1.  Two types of 529 plans exist – prepaid plans and savings plans.  D. 13 ¶ 3.  Prepaid plans allow account holders to buy units or credits at participating colleges and universities, and most are sponsored by states, D. 13-1, but can also be sponsored by some higher education institutions.  D. 13 ¶ 4.  Savings plans, on the other hand, typically allow the account holder to choose among different investment options, while the savings plan invests on the account holder's behalf.  D. 13-1.  Unlike a prepaid plan, tuition costs under a savings plan are "not locked-in at a present rate."  D. 13 ¶ 5.  Savings plans are either sold directly to the account holder or through a financial institution, operating similar to a retirement plan, and only states may sponsor them.  <u>Id.</u>

### B.     <u>Upromise and Intuition</u>

Both Intuition and Upromise provide services for 529 plans, including recordkeeping and administration management services.  D. 4 ¶¶ 3–4 (Aff. of Jeffrey Howkins); D. 35 ¶ 6(b) (Third Aff. of Jeffrey Howkins).

---

[1]In resolving the various motions, the Court relied upon the appropriate documents for each, the standards for which are discussed below.

Upromise, Inc. and UII are Delaware corporations with principal places of business in Massachusetts.  D. 1 ¶¶ 7–8.  According to Angus, Upromise, Inc. was founded in 2001 as an affinity program, whereby members accrued account credit on retail purchases for tax-deferred college savings accounts.  D. 13 ¶¶ 1, 7.  Upromise, Inc. later formed subsidiary UII.  D. 13 ¶¶ 7, 17.  While UII is registered with the Securities and Exchange Commission as a broker-dealer, id. ¶ 7, Upromise, Inc. and UII have also provided management, recordkeeping, administration, distribution and marketing services for 529 savings plans since 2002.  D. 4 ¶ 3; D. 1 ¶ 22.  When Upromise hired Angus, the company had no clients for its savings plan-related services.  D. 13 ¶ 8.  By 2013, Upromise provided program management and administration services across 31 "direct-sold, advisor-sold and prepaid 529 college savings plans" in seventeen states.  D. 1 ¶ 22.  Upromise primarily services college savings plans but has also provided services to Pennsylvania's 529 prepaid plan.  D. 35 ¶ 6(j).

Intuition is a Florida corporation with a principal place of business and headquarters in Florida.  D. 23 ¶ 1 (Aff. of Claude W. Collier, Jr.).  Intuition has never done business in Massachusetts.  Id. ¶ 2.  Intuition, which generally services prepaid plans, id. ¶ 6, provides administrative services to one college savings plan in Florida.  Id. ¶ 10; D. 13 ¶ 51.  According to Intuition, these "services are limited to such mundane and ministerial tasks as mailing quarterly statements and imaging applications and other forms."  D. 23 ¶ 10.

Upromise contends that Intuition is its "direct competitor . . . in the business of administering tax-deferred 529 college savings plans." D. 3 ¶ 5.  Upromise claims that recordkeeping for 529 plans "involves the same basic tasks: processing checks, processing enrollments, and processing redemptions."  D. 35 ¶ 6(f).  Upromise argues that "[f]rom a recordkeeping perspective . . . [the] distinction between the two types of Section 529 plans is

insignificant." Id. ¶ 6(c).  But Intuition contends that the administration of college savings plans and prepaid plans is sufficiently distinct such that Upromise and Intuition do not compete.  See D. 13 ¶¶ 37–38.  For instance, while Upromise claims that "any company that provides recordkeeping services to a Section 529 Plan is in competition with other companies that provide recordkeeping services to Section 529 Plans, regardless of the Plan types," D. 35 ¶ 6(g), Intuition asserts that "[b]ecause the nature and function of College Savings Plans are so substantially different from that of Prepaid Plans, the technology necessary to support the provision of services to one is markedly different than the technology necessary to support services provided to the other, and are not interchangeable."  D. 12 at 3.  Upromise asserts that Intuition has "mischaracterize[d] the Section 529 Plan industry and the business in which UII and Intuition are both engaged . . . ."  D. 35 ¶ 6.

### C.     Angus's Employment with Upromise

Angus began working for Upromise, Inc. on June 2, 2002 as a temporary Technical Projects Manager.  D. 13 ¶ 6.  Angus became a permanent employee on August 2, 2002, as Director of Customer Care and Project Management.  Id. ¶ 9.  On August 5, 2002, he entered into an employment contract with Upromise ("the 2002 Employment Agreement"), which included the following provision:

> During the term of my employment with the Company, and for a period of twelve (12) months thereafter, I will not, directly or indirectly, whether as owner, partner, shareholder, consultant, agent, employee, co-venturer or otherwise:
>
> (a) engage, participate or invest in any business activity anywhere in the world which develops or markets products or performs services which are competitive with or similar to the products or services of the Company, or products or services which the Company has under development or which are the subject of active planning at any time during the term of my employment  . . . ."

4

Id. ¶ 11.  In or around October 2002, Upromise began providing services to the state of Nevada, its first college savings plan client, at which point Angus began supporting both the affinity program and the college savings plans.  D. 13 ¶ 13.

In 2004, Angus was transferred to UII and promoted to Vice President of Client Services, responsible for all client service functions.  Id. ¶ 15.  In 2006, SLM Corporation acquired Upromise and its subsidiaries, including UII.  Id. ¶ 17.  Around the same time, Angus was promoted to Chief Operating Officer of UII.  Id. ¶ 22.

In 2008, Angus entered into another employee contract with UII in exchange for a $150,000 retention bonus.  Id. ¶ 24–25; D. 13-3.  That agreement included a provision stating:  "I acknowledge that I signed a Upromise, Inc., Employee Agreement Regarding Inventions, Confidentiality and Non-Competition Agreement and the terms relating to Inventions, Confidentiality and Non-Competition are not superseded by this Employment Agreement."  Id. ¶ 25.

From 2008 until Angus's separation from Upromise in 2013, he held a number of high-level positions.  D. 4 ¶ 11; D. 13 ¶¶ 26, 28.  On or about February 4, 2013, Upromise laid Angus off.  D. 4 ¶ 14; D. 13 ¶ 34.  On or about February 17, 2013, Angus signed a severance agreement ("the Severance Agreement") with Upromise in exchange for $450,000.  D. 13-4.  That agreement included a provision stating that Angus acknowledged that he signed the 2002 Employment Agreement and that its provisions were not superseded by the Severance Agreement.  D. 13 ¶ 36.

### D.    Angus's Hiring at Intuition

According to Angus, after his separation from Upromise, he considered starting his own business, which would provide savings plan-related services to the state of Texas.  D. 13 ¶ 42.

He contacted Intuition to inquire about whether it would be interested in preparing a joint bid for the Texas opportunity.  Id.  These conversations evolved into discussions about Angus's employment prospects with Intuition.  Id. ¶ 43–44.  Angus explained to Intuition CEO Claude Collier that he could not disclose confidential information about UII and could not solicit or provide services similar to UII's until February 2014.  Id. ¶ 43.  According to Angus, he did not believe that working on prepaid plans with Intuition would violate his non-compete obligations to Upromise.  Id. ¶¶ 43, 52.

Around May 21, 2013, Angus informed UII's president, Jeffrey Howkins, that he had accepted an offer to work for Intuition.  Id. ¶ 44.  Angus had accepted the position of President of the Savings Division at Intuition, reporting directly to Collier.  D. 5 ¶ 3 (Aff. of Neil McKittrick).

On May 29, 2013, Upromise sent letters to Angus and Intuition expressing concerns that Angus would be violating his non-compete agreement with Upromise by becoming Intuition's employee.  Id. ¶ 2.  According to Upromise, over the next couple of months, Angus negotiated with Upromise, through his counsel, reaching a purported settlement of the dispute in a telephone call on August 6, 2013.  Id. ¶ 3.  On August 7, 2013, Upromise's counsel sent Angus's counsel a draft settlement agreement ("the Settlement Agreement"), memorializing the agreed-upon terms.  Id. ¶ 4.  The draft included a provision that required Intuition to participate in the settlement.  D. 13 ¶ 47.  Angus's counsel proposed changes to the agreement;  Upromise felt these changes were inconsistent with the agreed-upon terms and rejected them.  D. 5 ¶ 4.  On September 3, 2013, Angus's counsel sent Upromise's counsel an email stating that "Mr. Angus is on board with the draft you proposed."  Id.  This was the only draft of the settlement agreement circulated among the parties.  D. 13 ¶ 47.  According to the Defendants, however, the Settlement Agreement was

"clearly rejected." D. 14 ¶ 11.  Counsel for Angus agrees that he sent Upromise's counsel the September 3 email stating that Angus was "on board" with the draft, id. ¶ 13, but Angus contends that "[b]ecause [Upromise's counsel] continued to demand Intuition's participation in any settlement, it was my understanding that we had no agreement." D. 13 ¶ 49.

On September 5, 2013, Upromise received a letter from Intuition in response to Upromise's initial May 29 letter expressing concerns about Angus's new employment being a violation of his non-compete contract. D. 5 ¶ 6.  Intuition acknowledged receipt of the letter and informed Upromise that it did not believe Angus's employment violated his 2002 Employment Agreement because it was not Upromise's competitor. D. 5-5 at 3.  Upromise's counsel spoke with Intuition's counsel by telephone the following day. D. 5 ¶ 7.  Intuition's counsel stated that he "vetoed" the settlement agreement because he was concerned that a third party may consider it to be anti-competitive. Id.  In that phone call, Intuition's counsel "made it clear," according to Upromise, that Intuition would not permit Angus to agree to the terms of the Settlement Agreement. Id.  Although Angus's counsel conceded in his affidavit that he told Upromise's counsel that "Angus would not sign the agreement without Intuition's agreement," D. 14 ¶ 16, according to Angus, Intuition did not attempt to persuade him not to enter into a "reasonable settlement agreement." D. 13 ¶ 50.  To date, Angus has not signed the Settlement Agreement. See D. 14 ¶ 16.

## III.   Standards of Review

### A.   Motion for Preliminary Injunction

To obtain a preliminary injunction, the Plaintiffs must show:  "(1) a substantial likelihood of success on the merits; (2) a significant risk of irreparable harm if the injunction is withheld; (3) a favorable balance of hardships, and (4) a fit (or lack of friction) between the injunction and

the public interest." <u>Nieves-Marquez v. Puerto Rico</u>, 353 F.3d 108, 120 (1st Cir. 2003) (citation omitted).   The Court may accept as true "well-pleaded allegations [in the complaint] and uncontroverted affidavits," <u>Rohm & Haas Elec. Materials, LLC v. Elec. Circuits</u>, 759 F. Supp. 2d 110, 114, n.2 (D. Mass. 2010) (quoting <u>Elrod v. Burns</u>, 427 U.S. 347, 350, n.1 (1976)), but when "courts are faced with affidavits at odds and must make a credibility determination between them, courts generally do not issue a preliminary injunction, but rather leave the issue for a jury to resolve."   <u>Rohm & Haas</u>, 759 F. Supp. 2d at 125, n.107; <u>see also</u> <u>Spencer Companies, Inc. v. Armonk Indus., Inc.</u>, 489 F.2d 704, 707 (1st Cir. 1973) (affirming trial court's denial of a preliminary injunction when a "major factual dispute" existed regarding the materiality of any misrepresentations and finding that the district court "was within its discretion to conclude that there was uncertainty whether [the plaintiff] would ever prevail on the merits").

Further, injunctive relief is an "extraordinary and drastic remedy." <u>Voice of the Arab World v. MDTV Med. News Now, Inc.</u>, 645 F.3d 26, 32 (1st Cir. 2011) (citation and quotations omitted); <u>see</u> <u>Winter v. Natural Resources Defense Council, Inc.</u>, 555 U.S. 7, 22 (2008).

### B.     Motion to Dismiss for Lack of Personal Jurisdiction

To meet its burden of establishing that the Court has personal jurisdiction over a defendant pursuant to Fed. R. Civ. P. 12(b)(2) under the prima facie standard, a plaintiff must "demonstrate the existence of every fact required to satisfy both the forum's long arm statute and the Due Process Clause of the Constitution." <u>United States v. Swiss Am. Bank, Ltd.</u>, 274 F.3d 610, 618 (1st Cir. 2001) (citation and quotations omitted).   The Court considers the facts alleged in the pleadings and the parties' supplemental filings, including affidavits.   <u>Sawtelle v. Farrell</u>, 70 F.3d 1381, 1385 (1st Cir. 1995); <u>Ticketmaster New York, Inc. v. Alioto</u>, 26 F.3d 201, 203 (1st Cir. 1994).   The Court will "take specific facts affirmatively alleged by the plaintiff[s] as true

(whether or not disputed) and construe them in the light most congenial to the plaintiff[s'] jurisdictional claim," then "add to the mix facts put forward by the defendants, to the extent that they are uncontradicted."  Mass. Sch. of Law v. Amer. Bar Ass'n, 142 F.3d 26, 34 (1st Cir. 1998); see Sawtelle, 70 F.3d at 1385.

### C.   **Motion to Dismiss for Failure to State a Claim**

To survive a motion to dismiss, a claim must be "'plausible on its face.'"  García-Catalán v. United States, 734 F.3d 100, 102–03 (1st Cir. 2013) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).  "First, the court must distinguish the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited). . . . Second, the court must determine whether the factual allegations are sufficient to support the reasonable inference that the defendant is liable for the misconduct alleged."  García-Catalán, 734 F.3d at 103 (citations and quotations omitted).  Reading the complaint "as a whole," the Court need not find that a party is likely to prevail in deciding a Rule 12(b)(6) motion, but only that its pleaded claims "suggest more than a sheer possibility that a defendant has acted unlawfully."  Id. at 102–03 (citations and quotations omitted).  As to a motion to dismiss for failure to state a claim, the Court is limited to considering the "facts alleged in the pleadings, documents attached to exhibits or incorporated by reference in the complaint, and matters of which judicial notice may be taken."  Nollet v. Justices of the Trial Court, 83 F. Supp. 2d 204, 208 (D. Mass. 2000).

### D.   **Motion for Transfer of Venue**

The Court may transfer a case to any proper venue "[f]or the convenience of parties and witnesses, and in the interest of justice."  28 U.S.C. § 1404(a).  The Court need not determine the best venue, but "merely a proper venue."  Astro–Med v. Nihon Kohden of America, 591 F.3d 1,

12 (1st Cir. 2009).  When considering a motion to transfer pursuant to 28 U.S.C. § 1404, the Court considers: "(1) the convenience of the parties, (2) the convenience of the witnesses, (3) the relative ease of access to sources of proof, (4) the availability of process to compel the attendance of unwilling witnesses, (5) cost of obtaining willing witnesses, and (6) any practical problems associated with trying the case most expeditiously and inexpensively."  F.A.I. Elec. Corp. v. Chambers, 944 F. Supp. 77, 80–81 (D. Mass. 1996) (citing Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508 (1947)).  The party seeking transfer bears the burden of proof and "there is a strong presumption in favor of the plaintiff[s'] choice of forum."  Astro-Med, 591 F.3d at 13 (citation and quotations omitted).

IV.     **Discussion**

   A.      **The Court Denies the Motion for Preliminary Injunction**

   Upromise has alleged breach of contract claims against Angus, D. 1 ¶ 1, and claims of tortious interference with contractual and business relations against Intuition.  Id.  Because the Court cannot find on this record that Upromise and Intuition compete against one another, it cannot conclude at this juncture that Upromise is likely to succeed on the merits of its breach of contract claim against Angus for breach of the non-compete provision in the 2002 Employment Agreement or the Settlement Agreement.  Nor can the Court find on this record that Upromise is likely to succeed on the merits of its tortious interference claims against Intuition.  Moreover, even if Upromise had made such showing as to its claims against the Defendants, it also has not demonstrated a significant risk of irreparable harm if the injunctive relief it seeks is not granted.[2]

---

[2]Having considered the proposed reply briefs in resolving the instant motions, the Court ALLOWS nunc pro tunc, D. 27, 34-36, Upromise's motion for leave to file a reply in support of

        *1.     The Court Cannot Find on this Record that Upromise is Likely to Succeed on the Merits of its Claims*

        a.     Non-compete provision

For a breach of contract claim, Upromise must demonstrate that the parties reached a valid and binding agreement, Angus breached the terms of the agreement and Upromise suffered damages as a result of the breach.[3]  <u>Michelson v. Digital Fin. Servs.</u>, 167 F.3d 715, 720 (1st Cir. 1999).  The Court cannot find on this record that Upromise is substantially likely to succeed in showing that Intuition competes with Upromise, and hence, that Angus breached the non-compete provision of the 2002 Employment Agreement.

The operative non-compete restriction is in the 2002 Employment Agreement:

> During the term of my employment with the Company, and for a period of twelve (12) months thereafter, I will not, directly or indirectly, whether as owner, partner, shareholder, consultant, agent, employee, co-venturer or otherwise:
>
> (a) engage, participate or invest in any business activity anywhere in the world which develops or markets products or performs services which are competitive with or similar to the products or services of the Company, or products or services which the Company has under development or which are the subject of active planning at any time during the term of my employment . . . .

D. 4-1 at 4.  Upromise's sole contention is that Angus breached this agreement by working for a competing company.[4]  Specifically, Upromise argues that Angus breached this non-compete by

---

preliminary injunction, and D. 37, 37-1, Intuition's motion for leave to file a reply to Upromise's opposition to its motion to dismiss.

[3]The Court applies Massachusetts law, as the 2002 Employment Agreement contains a Massachusetts choice-of-law provision.  D. 4-1 at 5.  Although Intuition argues that the Severance Agreement is not governed by Massachusetts law, D. 19 at 8, Intuition does not dispute that the 2002 Employment Agreement containing the non-compete provision at issue here is governed by Massachusetts law.  <u>Id.</u>

[4]At oral argument, Upromise's counsel noted the Plaintiffs' position that to find that Angus breached the non-compete, the Court would have to determine that Intuition was a competitor.

working for Intuition, as Intuition is its "direct competitor . . . in the business of administering tax-deferred 529 college savings plans." D. 3 ¶ 5. But the Defendants contend that the administration of college savings plans and prepaid plans is sufficiently distinct such that Upromise and Intuition do not compete. See D. 13 ¶ 38. Given the parties' conflicting positions disputing the key issue about whether Upromise and Intuition are competitors, the Court cannot say that Upromise has demonstrated a substantial likelihood of success sufficient to warrant the "extraordinary" remedy of preliminary injunctive relief. See Winter, 555 U.S. at 22; Spencer, 489 F.2d at 707. For instance, while Upromise claims that "any company that provides recordkeeping services to a Section 529 Plan is in competition with other companies that provide recordkeeping services to Section 529 Plans, regardless of the Plan types," D. 35 ¶ 6(g), the Defendants assert that "[b]ecause the nature and function of College Savings Plans are so substantially different from that of Prepaid Plans, the technology necessary to support the provision of services to one is markedly different than the technology necessary to support services provided to the other, and are not interchangeable." D. 12 at 3. Upromise, in fact, acknowledges the dispute in Howkins' third affidavit:

> In the Opposition Papers, Defendants and Mr. Collier attempt to draw a bright-line distinction between two types of Section 529 qualified tuition programs (which I refer to below as "Section 529 Plans"): Section 529 College Savings Plans (also known in the industry as "Investment Plans"), and Section 529 Prepaid Plans (also known in the industry as "Guaranteed Savings Plans"). They also assert that Intuition provides recordkeeping services to Section 529 prepaid Plans, that [UII] provides recordkeeping services to Section 529 College Savings Plans, and thus that Intuition and UII are not competitors in the business of providing recordkeeping services to Section 529 Plans. . . . These assertions by Defendants mischaracterize the Section 529 Plan industry and the business in which UII and Intuition are both engaged . . . .

D. 35 ¶ 5–6.

The Court appreciates Upromise's argument that, regardless of the distinctions between college savings plans and prepaid plans, the differences in the recordkeeping practices for the

two types of plans are negligible to non-existent, D. 34 at 2–3.  Still, the Court cannot find on this record that Upromise is likely to succeed in showing that Intuition competes in the 529 plan recordkeeping services space – the Court would be required to make a material factual determination as to whether the recordkeeping services that Upromise and Intuition provide to 529 plans are sufficiently similar and/or competitive such that Angus breached the non-compete by working for Intuition.  As an illustration of the quandary facing the Court, Intuition admits in a footnote that "a small part of [its] business involves the provision of records management services to College Savings Plans," D. 12 at 9, but claims that its "services are limited to such mundane and ministerial tasks as mailing quarterly statements and imaging applications and other forms."  D. 23 ¶ 10.  Upromise claims that recordkeeping for 529 plans "involves the same basic tasks: processing checks, processing enrollments, and processing redemptions."   D. 35 ¶ 6(f).   While Upromise argues that "[f]rom a recordkeeping perspective . . . [the] distinction between the two types of Section 529 plans is insignificant," D. 35 ¶ 6(c), the  Court cannot say on this record that the above tasks are identical, or even sufficiently similar to constitute competition, particularly in light of Intuition's ardent position, supported by affidavits, that it does not compete with Upromise.  At a minimum, the Defendants have cast sufficient doubt as to whether the recordkeeping functions for both plans are sufficiently similar to constitute competition such that the Court cannot find that Upromise has satisfied its standard to obtain a preliminary injunction.  Such determination is better left decided on a developed, undisputed record at the summary judgment stage or by a factfinder at trial.  See Rohm & Haas, 759 F. Supp. 2d at 125, n.107.

b.      Settlement Agreement

Upromise argues that if the Court declines to find a reasonable likelihood of success on the breach of contract claim regarding the 2002 Employment Agreement, the Court should, at a minimum, require specific performance of the Settlement Agreement by Angus.  D. 3 ¶ 10.  The Court, however, also concludes that Upromise has not shown a reasonable likelihood of success of showing that Angus accepted the terms of the Settlement Agreement, a requisite element for proving the existence of a valid and binding agreement for the second of its breach of contract claims.

 "The foundational requirements of a valid contract are 'offer, acceptance, consideration, and terms setting forth the rights and obligations of the parties.'"  JPMorgan Chase & Co., Inc. v. Casarano, 81 Mass. App. Ct. 353, 356 (2012) (quoting Haverhill v. George Brox, Inc., 47 Mass. App. Ct. 717, 720 (1999)).  At issue here is whether Angus accepted the terms of the negotiated Settlement Agreement.

"'Unless otherwise indicated by the language or the circumstances, an offer invites acceptance in any manner and by any medium reasonable in the circumstances.'"  Yiakas v. Savoy, 26 Mass. App. Ct. 310, 314 (1988) (quoting Restatement (Second) of Contracts § 30(2) (1981)).  Although "[a]cceptance may be manifested by conduct or words, or a combination of the two which are reasonable in the circumstances," Hunt v. Rice, 25 Mass. App. Ct. 622, 627 (1988), the Court cannot find on this record that Upromise is likely to show that Angus's actions constituted an acceptance of the Settlement Agreement.   According to the Defendants, the Settlement Agreement was "clearly rejected."  D. 14 ¶ 11.  Although Angus's counsel conceded that he sent Upromise's counsel the September 3 email stating that Angus was "on board" with the draft, id. ¶ 13, Angus contends that "[b]ecause [Upromise's counsel] continued to demand

14

Intuition's participation in any settlement, it was my understanding that we had no agreement." D. 13 ¶ 49.  The Court cannot determine at this point, given the competing affidavits presented by the parties, that Angus likely accepted the terms of the Settlement Agreement.  See Rohm & Haas, 759 F. Supp. 2d at 125, n.107.

c.      Element of Improper Motive or Means

Upromise also contends that Intuition tortiously interfered with the 2002 Employment Agreement with Angus and with the Settlement Agreement.  D. 6 at 12–13, 17–20.  The Court concludes that Upromise has not demonstrated a likelihood of success in showing an improper motive or means, a required element for each claim of tortious interference.[5]

To show an intentional interference with contractual relations, Upromise "must prove that: (1) [it] had a contract with a third party; (2) the defendant knowingly induced the third party to break that contract; (3) the defendant's interference, in addition to being intentional, was improper in motive or means; and (4) [Upromise] was harmed by the defendant's actions."  G.S. Enters., Inc., 410 Mass. at 272.  Similarly, to show tortious interference with advantageous business relations, the Plaintiffs must prove:  "(1) a business relationship or contemplated contract of economic benefit; (2) the defendant's knowledge of such relationship; (3) the defendant's interference with it through improper motive or means; and (4) [Upromise's] loss of advantage directly resulting from the defendant's conduct."  Am. Private Line Servs., 980 F. 2d at 36 (citing United Truck Leasing Corp. v. Geltman, 406 Mass. 811 (1990)).

---

[5]Although Upromise pleads "tortious interference with contractual and advantageous business relationships" as one cause of action in its complaint, under Massachusetts law, interference with a contractual relationship is a distinct cause of action from interference with a business relationship.  Compare G.S. Enters., Inc. v. Falmouth Marine, Inc., 410 Mass. 262, 272 (1991) with Am. Private Line Servs., Inc. v. E. Microwave, Inc., 980 F. 2d 33, 36 (1st Cir. 1992).

In regard to the non-compete provision of the 2002 Employment Agreement, the Court concludes that Upromise has not made a sufficient showing as to the third element as to either theory of the claim.   Upromise contends that "Intuition had full knowledge of Angus's non-competition obligations to Plaintiffs before Angus began his employment with Intuition" and that "[b]y hiring Angus and allowing him to perform services for Intuition in violation of his non-competition obligations, . . . Intuition is seeking to benefit unfairly and improperly from [Upromise's] goodwill and confidential information, to the detriment of [Upromise]."  D. 6 at 13. But Upromise has not provided evidence that Intuition's alleged interference with the non-compete was intentional.  To the contrary, Intuition has presented evidence that it did not believe Angus was violating the non-compete, a position of which it made Upromise aware.  D. 5-5 at 2–4.  Further, Upromise has provided insufficient factual support for the allegation that Intuition sought to "benefit unfairly and improperly," D. 6 at 13, where simply hiring an employee – whether or not the employee was subject to a non-compete with his former employer – is not sufficient to show improper motive or means.  For example, in Geltman, 406 Mass. at 817, "[the new employer's] apparent motives were to benefit his customers and himself financially."   The Court there cannot find that there was "enough evidence to warrant a finding that his real motive in these matters was to hurt [the plaintiff]."  Id.  Similarly, other courts applying Massachusetts law have concluded that interfering with a restrictive covenant simply by hiring an employee bound by such covenant is not sufficient to prove improper motive or means.  See, e.g., TalentBurst, Inc. v. Collabera, Inc., 567 F. Supp. 2d 261, 269 (D. Mass. 2008) (finding that interfering with a restrictive covenant by hiring an employee did not amount to improper motive).  Although the parties do not dispute that Intuition became aware that Upromise believed Angus would violate his non-compete by working for Intuition, see D. 5-2 at 1, Upromise has

not provided any support for the contention that Intuition engaged in any conduct more egregious than simply hiring Angus after he had already been laid off by Upromise.

Upromise also claims that Intuition tortiously interfered with the Settlement Agreement. D. 6 at 17.  Similarly, Upromise has not shown a reasonable likelihood of success in showing improper motive or means.  Upromise claims that after "extensive negotiations," Upromise and Angus reached the Settlement Agreement, to which Angus "manifested his final assent" on September 3, 2013.  D. 6 at 2.  Upromise claims that "Intuition has instructed Angus not to sign the [S]ettlement [A]greement," and that as a result, "Angus has failed or refused to execute the agreement."  Id.  While Upromise does not explain in its papers in support of the motion for preliminary injunction its basis for alleging that Intuition had an improper motive or means in interfering with the Settlement Agreement,  see D. 6,  the Court surmises that the basis is similar to that asserted for its claim regarding the non-compete.   As discussed above, the disputed factual record as to the events surrounding the negotiation of the Settlement Agreement, as well as to the Defendants' intentions during the negotiations, prevents the Court from granting a preliminary injunction on the basis that Intuition sought to benefit improperly by hiring Angus.

Accordingly, the Court finds that Upromise has not shown it is reasonably likely to succeed on the merits of its claims against the Defendants.

2.     *The Court Cannot Find on this Record that there is a Significant Risk of Irreparable Harm if Injunctive Relief is Not Granted*

Upromise has also failed to show a "significant risk of irreparable harm if the injunction is withheld."  Nieves-Marquez, 353 F.3d at 120.  Given that Upromise has not demonstrated a reasonable likelihood of success in showing that the parties are competitors, the Court cannot at this stage conclude that Angus's employment at Intuition would constitute irreparable harm.

Furthermore, Upromise, in the first instance, seeks that "[Angus] be enjoined from working for [Intuition] . . . for one year from the date that his employment with [Upromise] ended (*i.e.*, for the period from February 4, 2013 through February 4, 2014)."  D. 3 at 5; D. 3-1. On the other hand, Upromise bases its complaint and motion for preliminary injunction on the contention that the Settlement Agreement was valid and should be enforced, arguing that in the alternative to enforcing the non-compete, the Court should require Angus to "perform his obligations under the terms of his Settlement Agreement."  Id.; D. 6 at 1.  While the Settlement Agreement, among other conditions, would prevent Angus from having contact with existing Upromise clients, most notably, it would also allow Angus to continue working for Intuition and managing Intuition's existing prepaid 529 plans.  D. 5-3 at 2–8.  Although the Settlement Agreement bars Angus from soliciting new clients or working with Upromise's clients, it does not prevent him from responding to requests from new clients who request work for college savings plans.  To the contrary, the agreement explicitly states that Upromise "shall not seek to prevent Angus from working for Intuition."  D. 5-3 at ¶ 2(b).  The Settlement Agreement further compels Angus to agree that "through February 4, 2014, he shall not directly or indirectly solicit or seek new non-prepaid plan work, but if any such customers request such non-prepaid work or services, nothing in this Agreement shall prevent [him] from responding to such a request."  Id. Given that the basis for Upromise's preliminary injunction is the potential loss of good will and confidential information, D. 3 ¶ 5, the Court cannot conclude how Upromise will be irreparably harmed without the full injunctive relief it seeks in the first instance, while it seeks, alternatively at least, to enforce a Settlement Agreement that would allow Angus to continue working at Intuition at least in some capacity and even to work with certain 529 plans.[6]

---

[6] To the extent that Upromise seeks enforcement of the Settlement Agreement as an

As such, the Court finds that Upromise has not shown irreparable harm and denies the motion for a preliminary injunction.

**B.**     **The Court Denies Intuition's Motion to Dismiss**

Intuition has asserted four grounds for its motion to dismiss, which the Court addresses in turn.

*1.     The Court Has Personal Jurisdiction Over Intuition*

In determining whether a Court has personal jurisdiction over a non-resident defendant, the Court must decide whether exercising personal jurisdiction aligns with both federal constitutional requirements and the forum state's long-arm statute.  Astro-Med, 591 F.3d at 8. Because Massachusetts' long-arm statute is co-extensive with federal constitutional requirements, the Court need only conduct the constitutional analysis.  Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A., 290 F.3d 42, 52 (1st Cir. 2002) (citation and quotations omitted).

Due process requires that the Defendant have "certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice."  Int'l Shoe Co. v. Washington, 326 U.S. 310, 319 (1945) (citations and quotations omitted).   For specific jurisdiction, as opposed to general jurisdiction (which the Plaintiffs have not pursued here), Upromise must show:  (1) that its claims directly arose out of or are related to Intuition's Massachusetts activities; (2) Intuition purposely availed itself of the privilege of conducting activities in Massachusetts; and (3) the exercise of jurisdiction in

---

alternative form of injunctive relief, see D. 3-2, the Court denies this relief as well given its conclusion, previously discussed, about its likelihood of success on the merits regarding the enforceability of the Settlement Agreement.

Massachusetts is reasonable in light of the required factors.  Adelson v. Hananel, 510 F.3d 43, 49 (1st Cir. 2007).

a.      Relatedness

Upromise must plead that its claims "directly arise[] out of, or relate[] to, the defendant's forum-state activities."  Astro-Med, 591 F.3d at 9 (citations and quotations omitted).  This standard is "flexible" and "relaxed," id. (citations omitted), and "a defendant need not be physically present in the forum state to cause injury (and thus activity for jurisdictional purposes) in the forum state."  Id. at 10 (citations and quotations omitted).

Upromise has sufficiently alleged that the harm of breaching the non-compete or the Settlement Agreement – and accordingly, Intuition's role in inducing such breaches – arose in Massachusetts.  It is undisputed that while employed with Upromise, Angus worked in Massachusetts.  Upromise's principal place of business is in Massachusetts.  D. 1 ¶ 7.  Upromise would feel any harm that arises as a result of Intuition's alleged inducement to breach the non-compete or Settlement Agreement in Massachusetts, where it runs the business for which Angus worked.  Although Intuition argues that "the Plaintiffs allege the breach and tortious conduct have occurred in Florida," D. 18 ¶ 2, as in Astro-Med, Intuition's conduct in Florida was merely "a cause of the breach of contract – the actual injury – that occurred in [the forum state]."  591 F.3d at 10 (finding Rhode Island jurisdiction proper in a tortious interference case against a new employer, even though the California corporation made all its direct dealings with the employee, a Florida resident, either in Florida or in California).  Accordingly, the Court finds that Upromise has satisfied the relatedness prong.

b.      Purposeful Availment

The "defendant's in-state contacts must represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's involuntary presence before the state's courts foreseeable." Astro-Med, 591 F.3d at 10 (citation and quotations omitted).  Upromise alleges that Angus accepted Intuition's employment offer in May 2013.  D. 1 ¶ 31.  Upromise sent a letter to Intuition informing it of Angus's non-compete obligations around May 29, 2013.  Id. ¶ 35.  Despite the concerns raised by Upromise about a potential breach of the non-compete, Angus began to work for Intuition in or around July 2013.  Id. ¶ 34.  According to Angus, he was still living in Massachusetts during this period of time, as he did not sell his Massachusetts home and move to Florida until August 2013.  D. 13 ¶ 53.  Therefore, although Intuition states that it does not do business in Massachusetts, D. 19 at 7, it purposely availed itself of the privilege of conducting activities here by employing Angus, who was a Massachusetts resident subject to a non-compete agreement, even after Upromise informed it that the agreement's applicability was disputed and could be litigated.  D. 1-1 at 29–33.  Moreover, although Intuition was not a party to the 2002 Employment Agreement containing a Massachusetts choice-of-law provision,  D. 1-1 at 5, the company was made aware of the non-compete provision in this agreement, Upromise's position about its enforceability and Intuition maintained its new employment relationship with Angus.  See Medicus Radiology, LLC v. Nortek Medical Staffing, Inc., 2011 WL 9373, at *5 (D.N.H. January 3, 2011) (concluding that the defendant's purposeful availment had been shown where, even if it did not know about its new employee's non-compete prior to initial hiring and placement, "it cannot claim that it was unaware that its actions might have an effect in New Hampshire after it was notified by [plaintiff] . . . that its placement violated [plaintiff's] contract

21

with [its new employee]").  Under these circumstances, it was certainly foreseeable that Intuition could get hauled into court in Massachusetts to resolve this matter.  Accordingly, the Court finds that Upromise has shown purposeful availment.

c.      Reasonableness

The Court considers a number of factors in determining whether exercise of jurisdiction is reasonable:  "the defendant's burden of appearing, the forum State's interest in adjudicating the dispute, [Upromise's] interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of the controversy, and the shared interest of the several States in furthering fundamental substantive social policies." Astro-Med, 591 F.3d at 10 (citing Burger King Corp. v. Rudzewicz, 471 U.S. 462, 477 (1985)). The Court finds that these Gestalt factors weigh in favor of the Plaintiffs.  First, the Court finds that, while perhaps inconvenient, appearing in Massachusetts would not be unduly burdensome for Intuition, particularly given the admittedly nationwide nature of the parties' businesses.  See Pritzker v. Yari, 42 F.3d 53, 64 (1st Cir. 1994) (noting that "the concept of burden is inherently relative, and, insofar as staging a defense in a foreign jurisdiction is almost always inconvenient and/or costly, we think this factor is only meaningful where a party can demonstrate some kind of special or unusual burden. . . . In the modern era, the need to travel between New York and Puerto Rico creates no especially ponderous burden for business travelers").  Further, Massachusetts has an interest in hearing the case, given that the dispute over the non-compete is governed by Massachusetts law, D. 1-1 at 5, and because one of its corporate residents has allegedly been the victim of a tort.  See Abiomed, Inc. v. Turnbull, 379 F. Supp. 2d 90, 96 (D. Mass. 2005) (finding that the second factor supports jurisdiction because "Massachusetts has an interest in adjudicating this dispute because one of its corporate residents has allegedly been the

victim of misappropriation"). Although Intuition has no employees or office in Massachusetts – and although "all percipient witnesses to the hiring of [Angus]" are arguably located in Florida – "[Intuition's] position becomes manifestly untenable when [Upromise's] companion litigation against [Angus] is factored into the mix." Astro-Med, 591 F.3d at 11. Angus does not dispute that Intuition has the right to sue him in Massachusetts and, as in Astro-Med, the foreign witnesses were "heading for trial" in Massachusetts in any case. Id. Accordingly, the Court finds that the exercise of jurisdiction over Intuition is reasonable and that it has specific personal jurisdiction over Intuition.

> ### 2.  *The District of Massachusetts is a Proper Venue*

Intuition has asserted that venue in Massachusetts is improper. D. 16. The Court will address the question of venue for both Defendants here, as the issue of whether the Court should transfer this case to the Middle District of Florida – as requested by both Defendants, D. 15, D. 29, and discussed in full below – involves similar considerations.

In a diversity action, venue is proper in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated." 28 U.S.C. § 1391(a)(2). In determining where a substantial part of the events occurred, the Court looks "not to a single triggering event prompting the action, but to the entire sequence of events underlying the claim." Astro-Med, 591 F.3d at 12 (quotations and citations omitted). The Court does not focus on the actions of one party, but takes a "holistic view of the acts underlying the claim." Id. at 12. Here, the Defendants argue that venue is not proper in Massachusetts because they reside in Florida and because the alleged breach of contract and tortious interference occurred in Florida. D. 18 at 2. However, the events leading up to Angus's actual employment with Intuition are significant and necessary to

Upromise's claims.  Upromise entered into the 2002 Employment Agreement with Angus in Massachusetts – the district where Upromise, Inc. and UII are headquartered – while, according to Angus and uncontradicted by Upromise, he was still a Massachusetts resident.  D. 13 ¶ 53.  The 2002 Employment Agreement contained a Massachusetts choice of law provision.  D. 1-1.  When Intuition hired Angus in May 2013,  D. 1 ¶ 31, he was still a resident of Massachusetts.  As such, this district is where "the harms of [the] torts were felt," <u>Astro-Med</u>, 591 F.3d at 12, making it an appropriate venue for this case.

       *3.*     *The Court Allows the Plaintiffs to Amend their Summons to Cure Their Service of Process Defect*

Intuition contends that the complaint should be dismissed for improper service of process – namely, that the summons served on Intuition does not state the name and address of Upromise's attorneys.  D. 18 at 2.  Pursuant to Fed. R. Civ. P. 4(a)(1)(C), a summons must "state the name and address of the plaintiff's attorney."  While insufficient process is an appropriate defense, Fed. R. Civ. P. 12(b)(4), the Court may "permit a summons to be amended."  Fed. R. Civ. P. 4(a)(2).  Seeing no prejudicial harm that has occurred to Intuition as a result of the Plaintiffs' failure to include their attorneys' information in the summons, the Court allows them to amend their summons, pursuant to Fed. R. Civ. P. 4(a)(2), to reflect their attorneys' names and addresses.

       *4.*     *Upromise Has Sufficiently Pleaded Its Tortious Interference Claims*

The final ground on which Intuition relies for its motion to dismiss is that Upromise has failed to state a claim for tortious interference.  D. 19 at 1.  The Court concludes that Upromise has sufficiently stated a claim for both tortious interference with contractual relations and tortious interference with advantageous business relations.

     a.     Upromise Has Stated a Claim for Tortious Interference with
Contractual Relations

The Court will not repeat the elements of these claims, as previously recited.  Although the Court cannot say that Upromise is likely to prevail on this claim, it has plausibly stated such claims.  First, Upromise has plausibly stated a claim for tortious interference with contractual relations as to the non-compete.  Upromise has alleged that it had a contract with Angus, D. 1 ¶ 16, a third party.  Upromise further alleges that it informed Intuition of the potential breach of Angus's non-compete around May 29, 2013, id. ¶ 35.  Intuition, however, allowed Angus to begin working in or about July 2013, before the matter was resolved.  Id. ¶¶ 34, 36. Accordingly, the "reasonable inference" from Upromise's allegations is that Intuition hired Angus and allowed him to begin working – well aware that he was potentially violating his non-compete – for an improper purpose, such as appropriating Upromise's good will and confidential information.  See García-Catalán, 734 F.3d at 103 (citations and quotations omitted).  Upromise has also alleged that it suffered damages as a result of Intuition's conduct.  D. 1 ¶ 53.  These allegations are sufficient to state a plausible claim for tortious interference with contractual relations.

Similarly, in regard to the Settlement Agreement, Upromise alleges the existence of a Settlement Contract and Upromise has further alleged that Angus's counsel informed Upromise's counsel that Angus was "on board with the draft."  D. 1 ¶ 41.  Assuming these facts are true, as this Court must for the purposes of this motion, there has been sufficient pleading of this element of the existence of a contract.

Upromise has also sufficiently pleaded the second and third factors of the tortious interference with contract claim.  Assuming that Angus did in fact accept the terms of the Settlement Agreement as Upromise alleges, it has been pled that Intuition knew that Angus had

entered into the agreement with Upromise and allegedly induced him to refuse to sign the document or abide by its terms.  D. 1 at ¶¶ 42-43.  It is plausible that such action could constitute improper means or motive.  Finally, Upromise has alleged that it suffered damages as a result of Intuition's tortious interference.  Id. ¶ 63.

> b.  Upromise Has Stated Claims for Tortious Interference with Advantageous Business Relations

Each of Upromise's tortious claims are alleged also as tortious inference with advantageous business relations claims.  Upromise has also sufficiently pleaded causes of action for tortious interference with advantageous business relations.  As to the 2002 Employment Agreement, Upromise alleges that its agreement with Angus contained a non-compete provision, and Intuition became aware of this agreement in the wake of Upromise's objections to its hiring of Angus, its former employee.  D. 1 ¶ 35.  As to the Settlement Agreement, Upromise has alleged that it negotiated with Angus and reached an agreement to resolve the dispute about his obligations under the non-compete.  D. 1 ¶ 36.  That agreement would restrict Angus's contact with Upromise's clients, among other conditions, until August 4, 2015.  Id.  Upromise has alleged that Intuition knew about the contemplated agreement.  Id. ¶ 42.  Finally, as discussed above, Upromise has sufficiently pleaded the final two elements, Intuition's alleged interference with such business relations through improper motive or means and Upromise's alleged damages as a result of Intuition's actions, for these tortious interference claims.

For these reasons, the Court denies Intuition's motion to dismiss.

## C.     The Court Declines to Transfer the Case to the Middle District of Florida

Although venue is arguably proper in the Middle District of Florida, the Defendants have failed to sustain their burden of overcoming the "strong presumption" in favor of allowing Upromise's choice of forum.  Astro-Med, 591 F.3d at 13; see also Fairview Mach. & Tool Co.,

Inc. v. Oakbrook Int'l, Inc., 56 F. Supp. 2d 134, 141 (D. Mass. 1999) (citations omitted) ("[T]he burden of proving that a transfer is warranted rests with the defendant[s]").  Of the factors the Court considers, "convenience to the expected witnesses is probably the most important factor." Fairview Mach. & Tool, 56 F. Supp. 2d at 141 (quotations and citations omitted).   The Defendants "must specify the witnesses to be called and must make a 'general statement of what their testimony will entail.'" E.E.O.C. v. Texas Roadhouse, Inc., No. 1:11-CV-11732-DJC, 2012 WL 5894910, at *2 (D. Mass. Nov. 9, 2012) (quoting Princess House, Inc. v. Lindsey, 136 F.R.D. 16, 18 (D. Mass. 1991).  Aside from Angus and the management team at Intuition, the Defendants have not identified any witnesses for whom this district would be an inconvenient venue.  The Defendants have not, for instance, "made any showing that the cost of bringing its witnesses to Massachusetts will be unduly burdensome, nor that any of its witnesses are unwilling or unable to appear."  Texas Roadhouse, 2012 WL 5894910, at *2.  Further, the significance of the inconvenience to the witnesses identified by the Defendants is diminished because they are "employees of one of the parties and their appearance can be therefore secured by the employer." Id. (citing Sivert v. Harsco Corp., No. 09-10107-FDS, 2009 WL 3300031, at *4 (D. Mass. July 7, 2009)).

The Court also considers "the convenience of the parties [], the availability of documents and the interests of justice."  Fairview Mach. & Tool, 56 F. Supp. 2d at 141 (citing Home Owners Funding Corp. of America v. Century Bank, 695 F. Supp. 1343, 1347 (D. Mass. 1988); Princess House, Inc. v. Lindsey, 136 F.R.D. 16, 18 (D. Mass. 1991)).  The Defendants argue that the convenience of the parties also supports a transfer to the Middle District of Florida, particularly because, they contend, Intuition's headquarters are located there, Angus now lives there and Upromise would not be prejudiced because the litigation only recently commenced.  D.

15; D. 16.  While the Defendants may more conveniently defend against Upromise's claims from Florida, two of the Plaintiff corporations are headquartered in Massachusetts.  Transferring this action to the Middle District of Florida would merely "'shift the inconvenience from one party to the other.'"  Blu Homes, Inc. v. Kaufmann, No. 10-11418-DJC, 2011 WL 3290362, at *10 (D. Mass. July 29, 2011) (quoting Kleinerman v. Luxtron Corp., 107 F. Supp. 2d 122, 125 (D. Mass. 2000)).  The Defendants further argue that transferring this action would serve the interests of justice because the Middle District of Florida has a stronger interest in adjudicating this action than the District of Massachusetts, as "all of the alleged breaches of contract and other wrongful conduct that Plaintiffs claim Defendants have committed arose in Jacksonville, Florida."  D. 16 at 8.  While the Middle District of Florida may have some interest in this litigation because the Defendants reside there, the District of Massachusetts has at least an equally strong interest in this action for the same reasons, given that two of the Plaintiffs have principal places of business here.  Furthermore, because many of the events giving rise to the action took place in Massachusetts – and, as discussed above, the effects of the alleged breach and tortious interference are felt here – the District of Massachusetts has a greater interest in adjudicating this claim than the Middle District of Florida.  For these reasons, the interests of justice weigh against transfer.

In terms of any practical problems associated with trying this case most expeditiously and inexpensively, the Court sees no reason why the remaining factors would weigh in the Defendants' favor, considering that if the case is moved, the Plaintiffs – as opposed to the Defendants – would be required to litigate in a foreign forum.

For these reasons, the Court finds that venue is proper in Massachusetts and declines to transfer this case to the Middle District of Florida.

**V.**      **Conclusion**

For these reasons, the Court DENIES the motion for preliminary injunction, D. 3, Intuition's motion to dismiss, D. 18, and Angus's motion to transfer this case to the Middle District of Florida, D. 15.  The Court further ORDERS that the Plaintiffs amend and serve their summons on Intuition within ten days of this Order.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge